Next case on the docket is Kirk v. Allstate Insurance Company, cause number 5-10-573, and Mr. Coker. Whenever you're ready. My name is Chris Coker. I represent Stephen Kirk, as asked me of the claims of Inder Mahdi v. Allstate Insurance. And at the onset, I'd point out that assignment situation at the time. Really, the claimant, Kirk, is in the shoes of the insurer, Mahdi. And this incident first arises in June, late June of 2006, which was actually the 4th of July weekend in Alton, Illinois. And if you've ever been up there by the marina, they have that 4th of July celebration. And as the facts of the underlying case go, Mahdi ran a stop sign, hit Kirk, and on impact, Kirk was on a motorcycle, amputated his leg. Horrific damages. And immediately after that accident, Allstate contacts Mahdi, because Allstate was the primary insurer. There was a secondary insurer, Rotary Insurance. And Allstate contacts Mahdi and gets a recorded statement and gets some very, what I would call, basic facts that you want when you're an insurance company. Like, where do you live and how do we get ahold of you? They got the correct contact information from Mahdi, asked him about the accident, and that's the last Inder heard from them for over a year after that. What Inder didn't know is in the meantime, Mahdi had hired Meijer Law Offices in Alton. You may know Russell Meijer. It's Russell's firm. His daughter had just moved back from Nevada, Amy Meijer, and in fact wasn't even licensed at the time this case arose. So they realized that Kirk's damages were over the $100,000 policy of Allstate and made a policy demand. And when reviewing the Allstate claim notes and talking to Rick Green, the adjuster for Allstate, Allstate agrees. We're in trouble. They understand that the damages with the amputated leg are going to be over $100,000. And in fact, they have a set of things they do because of the danger situation it creates. And obviously, if the damages are over the policy, it may subject the insurer personally to liability. And because insurance is supposed to protect the insurer, that creates problems. So when those red lights went off, Green's adjuster, Rick Green's supervisor, Sonny Sperban, sends a note to Green that says, hey, danger. This is an excess case. In essence, it says, make sure that if you get a release on this case, make sure that Mahdi, the insured, which Green said was Mahdi, is on the release. Don't do it without it. Don't write a check without him being released. In the meantime, Amy makes the demand for $100,000. Rick Green sends a release to her for the $100,000. And Amy sends him an email. I think it's in my brief. At 3.04 p.m., she sends the email and says, hey, can you take Mahdi's name off the release? Three minutes later, with no negotiation, no contact whatsoever to Mahdi, never asking his consent, never giving him a chance to come in and say, hey, can I be part of this, Green says, oh, sure. And not only does he say yes, but he even drafts it, creates this new release that says, okay, Mahdi's taken off, here you go, and supposedly we're done. I want to point out that Mr. Mahdi would not call this a settlement because he wasn't released. Maybe it was a release for Allstate. But in any event, the case goes forward. The suit gets filed against Mahdi. Allstate never tells him that it's filed against him. He gets served. Eventually, there's a trial, a verdict of over $1 million against Mahdi. After the trial, Mahdi decides his interests occur, and this case starts to go forward. Let me ask a factual question. You indicated that after the telephone interview, Allstate had no contact with Mahdi, and my understanding was they were sending letters, but to the wrong address. They had the correct address from the interview, and so they sent out an excess policy defense type letter, but it just went to the wrong place. He never got it. Absolutely. And I would also point out, it brings up a good point because it gets to the defendant's cases, whether that's negligence or willful malign conduct, bad faith under the jury instructions by our Supreme Court has a standard of negligence. But yeah, they sent it to the wrong address when they had the right address. And I take it they were not sent certified mail. I don't believe they were. There's no evidence to the record that they were. They should have come back if – You would assume that that would have been the case. Okay. But in all of this, I always think it's important – I step back and I survey insurance cases to remember why we have these certain rules of insurance. It's really a basic scenario. In a normal consumer transaction, Joe the consumer goes to the store. They want a loaf of bread. Joe gives the vendor a dollar. They get a loaf of bread back. You're done. And the insurance transactions are different. So you have a consumer who goes to Allstate, gives $100. Allstate invests it and makes $130 off of it. And in return, they get nothing tangible. What they get is Allstate says, hey, because of your $100 each month, I'm going to give you a promise. And that promise is, hey, I got your back. That if you make a mistake, if there's a claim filed against you, I'll take care of you. I'll be your wingman. I'll be your good hands, people to catch you. I'll be your neighbor, your rock. I'll take care of you. Up to the limits of the policy. Well, if they violate that, then they take care of it over that. If they don't settle for the insurance, then yes, there's consequences. But by the time a claim comes, there's this imbalance of power. The insurer of Allstate already has the money. The insurer has given up the money and needs their help. I mean, if there wasn't, with this imbalance of power, what courts all across the United States have done is said, hey, so that you don't run off, we're going to create this fiduciary duty that runs from the insurer to the insurer. And Justice King talks about this in a little bit of a different light in the O'Neill decision. He talks about how because the insurer controls the defense and the settlement part, that they have these fiduciary duties to the insurers, which makes sense. And out of that duty, out of that fiduciary duty, there stems these other duties that are really basic. And they stem from the very idea that insurance is pooled risk to help the insured so they don't get hit. But one of the basic premises that there's no dispute here is that the insured, in order to tender limits and the insured get out, you have to get the consent of the insured. You have to. And that makes sense. And if you can't just dump it in and then leave, you have to communicate to the insurer. And you have to, in settling the case, you have to at least give equal consideration to the insurer. Those are really basic rules, and none of them were followed here. And obviously, Amini didn't have, wasn't given, didn't consent to this idea. And I think it's important to remember that the policy money, Rick Ring testified, the real leverage an insurer has to face is that money, that $100,000 is what gets the other side to move. But he wasn't able to get that or even get involved in those discussions. The defendant raises some questions like, oh, what was Allstate to do in a situation like that if there's a policy limits demand? And this court in Douglas provides some of those answers, now provides some, that are very basic. The easy answer is communicate with your insurer. Ask them, hey, what do you want us to do here? Do you want to get your own lawyer? Do you want to come in? What do you want? The other answer, the other easy answer is, if it's a matter of Meyer wanting to get this extra policy, which, of course, Mercury said didn't stack, but if that's it, give a release with Amini, except to the extent that Mercury has to pay out on their policy. We've all done those releases. To do a limited release is to say you give us Mercury money, but otherwise, Amini's going to be bulleted. In Douglas, this court said, well, give the policy to the insurer like Amini and let them decide how they want to deal with it. File a reservation of rights or file a debt damage or other things that are really simple that can happen. But none of those were done here. Amini never even knew it. He never knew he was exposed to this huge verdict. We rely mainly on two Fifth District cases for support for our rule, and the first one is Douglas. And ironically, if you remember the Gallant days, Ally American was the predecessor to Gallant, and one of my first debt pay cases was a Gallant case, although I don't say that too much, because they were such a horrible insurer. But it was an excess case where Ally just walked away. They actually did more than all say did in this case. They told their insurer they were walking away because they tendered it to the court. And this court said in the very first paragraph of the analysis, the court says, You know, plaintiff contends that there's a breach of duty when the insurer tenders the limits without getting a release of their insurer or a settlement of their insurer and walking away. And this court says two words that stand relevant here. We agree. And the court then goes forward and explains, you know, if you want to try and pull something like that, file a debt action, pay the money to the insurer, or do one of these many other things, and says again, but paying limits without the consent of the insurer and walking away is bad faith. And that's true here. You can't do that. The court had the chance to revisit similar circumstances with yet another Gallant case in 2004, and that's the one Justice Keene wrote that one of the best decisions in this court I've read. And he states in the first holding, and this court states, When an insurer is sued for refusal to settle, bad faith lies in the failure to at least give equal consideration to the insurer. It's exactly the case here. There was no settlement. In fact, we know that because there was a trial against the meeting. There was no equal consideration given to the meeting. There's not even a dispute about that. He got screwed. That is bad faith. I would almost liken it, and the defendant keeps on saying, well, we gave this money. I'd almost liken it to the time when maybe there's a policy limits demand made at the beginning of the case, but it's tendered all the way at the end after the jury comes back. But there's still the bad faith that he's screwed up and hasn't gotten a settlement to protect the insurer. In O'Neill, they also go through, and I don't want to bore this court with going through the same seven factors that Justice Keene and this court went through, but none of those factors were met here. There was no communication. There was no interest given to the insurer. Oddly, in this case, the things that the trial court did in entering this Army judgment, it said that it was doing so because it thought that Kirk induced this release. And very basically, A, that's not in the record. First of all, Kirk is the plaintiff in this case, but as an assignee of Meadey. If the court thinks it's teaching Kirk a lesson, it's doing so at the expense of Meadey, who's got that million-dollar judgment that's picking on the wrong person. But the insurer, Kirk stands in the shoes of the insurer, and I think that's a point the trial court had trouble dealing with. But equally as important is there's no inducement. Rick Green testified it was his job all day long to deal with opposing sides. In fact, said he knew not to trust the other side. He knew that this is what he did, and he didn't even negotiate. There was no inducement. He just said yes. He's the one who even drafted the release that took him off. So I think the record's clear. There's no inducement, and therefore summary judgment wasn't proper. The other argument I just want to briefly touch on now, I don't know how much time I have left, that the defendant raises, is that basically, well, we paid $100,000. What is the benefit of that $100,000? That, say, reminds me, and I live in Caseyville Township, where we have a volunteer fire department called Alleywood Heights. If someone's house burns and the neighbor kid pours a cup of water on it, well, maybe that helps a little bit to put out the fire. But you want the fire department there to help you out. And that's what the failure is here, is to blast all that leverage of the full fire department behind them to try and get the case resolved at that early stage. I would ask one other point. When the defendant is up here, I'm curious, does Allstate really believe that under Illinois law, they can just tender the policy of the case without ever talking to their insurer, exposed to their insurer to an excess limit, and then just walk away? I don't think that's the law in Illinois. And if it was, I think, unfortunately, this court would be beleaguered with many such cases if that happened. I think they have to consider their insurer's interests. If there's no further questions, I will sit down. All right. Thank you, Mr. Coker. Thank you. Mr. Badesky. Let me ask you an early question, okay? I take it you're not supporting the reasoning in the order that it was proper to grant the motion for summary judgment because Kirk induced the release. That's not the basis of my argument. Right. I mean, you didn't talk about that in your brief, I don't think. I mean, you talked about other things. I mean, you agree, don't you, that, I mean, Kirk is, in this case, asking me immediately. And it doesn't really make much sense to talk about whether Kirk induced it. Do you agree with that? Well, I mean, his lawyer asked for what she got, and Allstate gave him what they wanted. And I think that was the basis of what the trial court decided, is you can't claim bad faith against an insurance company when you had asked the insurance company to do what you wanted them to do. That's what the court decided. What about the fact that he's, in this case, has an ass in the knee of meeting, though? He steps in his shoes, doesn't he? He steps in his shoes, but he's still a plaintiff in the case. At the time, Your Honor, at the time this happened, that the release transaction occurred, Amy Meyer was acting as the agent of Mr. Kirk. So at the time that this happened, there was no assignment. There was inducement as an agent of Kirk. So I would say, yeah, there was an inducement. So although you didn't argue it in your brief, you had not. You do stand behind the trial judges? Oh, yeah, absolutely. Because, I mean, the assignment occurred after all this was over with. At the time of the transaction, there was no standing in the shoes. It was Kirk that wanted this, and we gave him what he wanted. Your Honor, I need to add some facts that were omitted to the argument, because they're extremely significant in this case. The first thing I do want to mention, though, is summary judgment was properly entered because there was no dispute as to any material fact. And, in fact, I don't think Mr. Coker has mentioned any dispute as to any of the facts. So that's not the basis of a potential reversal here, I would say. This is purely a matter of law. It's a question of whether or not the release that was entered is proper or not proper under Illinois law. The other thing I want to get out in front here, okay, there was no summary judgment on the duty to defend. There's a lot of discussion about, oh, you know, Allstate just left him. You know, Allstate screwed him. They forgot about him. Allstate owed a duty to defend Mr. Hamadi. There's no question about that. That's an issue in the underlying case as to what happened with the defense in the underlying case. So that issue is still pending before the trial court, the duty to defend. There was no summary judgment regarding the duty to defend. That's definitely there. Allstate owed him a defense. I'm not up here telling you that, you know, summary judgment was about duty to defend. So that Douglas case really has nothing to do with this particular case. What I do want to say is this. As Mr. Coker mentioned, we have a very significant accident. Allstate investigated it. It determined right away that it's ensured Mr. Hamadi was certainly at fault, completely at fault for the accident. He had a duty to basically yield to Mr. Kirk, who's coming downhill. It's happening in the downtown area of Allstate, a bunch of hills. He's coming, Mr. Kirk's heading downhill, and Mr. Hamadi pulls out in front of him. Terrible accident. Hamadi's at fault. Within a couple months of the accident, Mr. Kirk incurs over $100,000 in medical bills. He had an amputated leg. It's a $100,000 policy that Allstate provides coverage to Mr. Hamadi. But also Lindsay Skendary. She was the owner of the vehicle. Mr. Kirk, or Mr. Coker, omitted from his discussion here, there was claims against two insurers. It wasn't just Mr. Hamadi. It was against Lindsay Skendary as well. Does that in any way change the duties they owed Hamadi? Oh, no. But the point I'm trying to make is the scenario that the judge was presented with at the time, claims against two insurers. The man has lost his leg. It's far in excess of $100,000 policy limits. And there's a policy limits demand made. So the Allstate adjusted. What's he going to do? The insurer is clearly at fault. Hamadi's clearly at fault. There's claims against two insurers. In fact, Amy Meyer wanted to know whether Skendary had additional assets. She thought he owned a bunch of restaurants. There's an affidavit I put in the record in my brief that he didn't have any additional insurance, or she didn't have any additional insurance. So there was a concern that Skendary, they're coming after Skendary personally as well. The other thing we know is there's clear liability. And the last thing is the policy limits demand. What is the insurance company going to do at that point? Do they really have any authority? Do they really have any power to try to negotiate off the policy limits? When Mr. Hamadi is clearly involved, Mr. Kirk lost his leg. He's already incurred $100,000 in medical only within two months after. This case is far in excess of the policy. Was there really authority? Do we expect Mr. Green to say, oh, listen, Amy, you know, I'll give you $80,000, but we've got to have both of those people on the release here. You know, $80,000. You know, take $80,000. Don't take $100,000. That wouldn't be bad faith. That wouldn't be bad faith. There's absolutely no question. Well, aren't we talking about a lost opportunity here, though? I mean, what Hamidi didn't get a chance for was to even be at the table because he wasn't notified any of this was going on. Right. He could have hired his own attorney. Exactly. That attorney could have made demands on Mercury. The whole thing may have got settled and not have an over-a-million-dollar judgment against him. Well, Your Honor, the cases that talk about communication with the insured, the case that was mentioned here, the O'Neill case, what O'Neill mentioned in there was this was a failure to pay. There was an opportunity to settle within the policy limits. That is when the insured needs to be made aware that communication is because there's an opportunity to settle within the policy limits. That never happened here. There was never an opportunity to settle the claim against Hamidi within the policy limits. The reason was there's another policy there with Mercury. All state has no control over that. But if Hamidi was at the table and laid out his finances, they might have said, Hamidi, pay us $5,000, personal, and we'll release you. But he didn't get that opportunity because he didn't know any of this was going on. Right. Well, he was negotiating with Mercury Insurance at the same time. There's another insurance company involved here. All state was not presented with a situation where they were going to potentially settle within the policy. Rick Green, and he wasn't asked this in his deposition, but I'm sure he was thinking, well, obviously they're going to pay the $50,000. We paid our $100,000. This guy lost his leg. Hamidi's at fault. I mean, why would he anticipate Mercury's not going to pay the $50,000? So the release that was ultimately entered into that was requested by Amy Meyer. He got, Mr. Kirk got $100,000. Mr. Hamidi got a complete set up of the full $100,000. And he's entitled to a defense. So settlement or no settlement, Hamidi's in the same position he would have been in if there was a settlement or not because he gets a complete set up. The money wasn't just paid. Well, now the money's gone. Now he's unprotected. Even if he wouldn't have been on the release, even if there was no agreement made and Allstate said no, look, either you put Hamidi's name on the release and it applies to him completely or no deal, he's in the same position he would have been in to begin with. Complete $100,000 liability protection, is entitled to a defense, agreement or no agreement. Amy Meyer is negotiating with Mercury Insurance. Allstate has no control over Mercury. I would think that Mercury would pay. Why they didn't pay, I don't know. Maybe they had some coverage issue. I don't know why that was. But the reason why she even requested that he be taken off the release, the reason I wouldn't name him specifically, was because she was negotiating with Mercury. She's not going to take $100,000 to settle and she can get an additional $50,000 and her client's lost his leg. $150,000 is more than $100,000. So what's happened here is basically, as a result of the release, Scandaria is completely released. We had claims against two insurers and then there's an argument, well, you know, there's really no negligent entrustment claim. It didn't make any difference. You know, the claim against Scandaria didn't matter. Well, when you're dealing with the Legoff case and you only have $100,000 and there's claims against two insurers, you'll do both. I think try to settle what you can settle. And if they're not going to take the $100,000 and settle both, try to get as much settlement as possible. Otherwise, now we've got another person in the case. Scandaria potentially could be sued as well as not. So what was done was Scandaria is completely settled. Hamadi has given a complete set-up of the full $150,000 and the same duties are owed. So I would have to say that in terms of what the adjuster did, he got the best bargain he could do for his insurance given the negotiation circumstance presented here. And I mentioned a couple of cases in my brief, and this was a question that was raised. About this, well, does Illinois law allow this type of release to occur? I cited almost identical facts here, this Pekin v. Home Insurance, where you had an individual insured by Pekin, this elder. He's an employee of the Chicago White Sox. He gets into a motor vehicle accident. He only has a $25,000 policy with Pekin. The White Sox are an additional insurer under that policy, under the policy language. There's a negotiation made. Pekin tenders the $25,000, gets a complete release for elder, but the White Sox are not released. So then later on the White Sox get sued under a respondeat superior claim. Home Insurance and the Sox say, hey, that release was in bad faith. You didn't even tell us that you were negotiating. You gave us no information that this was happening. And the court said, no, it's not in bad faith because the Sox are not in any worse position they would have been in if there had been no release. The reason why is they were given a complete set-off of the full $25,000 in the release that was entered between elder and the plaintiff in that case. And that's really what the court focused on. There's really no damage to the White Sox because they were given a complete set-off. Again, you had a situation where there would have been two insurers. There would have been claims against both. Damages would have exceeded the policy limits, and the insurance company did as much as it could do, at least get one insurer off, get a set-off for the other insurer. And that's the best scenario that the insurance company could have done there. Another case that followed this Pekin was this Country Mutual v. Anderson. Trucking accidents, significant injuries. There was a Country Mutual policy and a separate Pekin policy, multiple insurers. Basically, Country Mutual and Pekin decided to tender their limits, but there was an additional insurer out there that was insured by Wausau. The plaintiff wanted all three policies to settle the claim. Wausau didn't want to do that, so they settled the claim, got the set-off, and Wausau ended up appealing, saying that was in bad faith. It argued that any time that there's going to be a settlement, there should be a release for all insurers before settling for the policy. That was the argument that Wausau made in the Country Mutual case. And that's never been the law in Illinois. The court said, no, that's not the law. The set-off was the key, and it cited Pekin for that. The insurer that Wausau insured in that case, Elgin, I think it was, Elgin Stone, they were given a complete set-off, and that was the key in the case. They were given a set-off. So even though there was a settlement, removed some of the insurers, the remaining insurer was given the full benefit of the policy that would have applied to that insurer. The court mentioned it as a carrier's unreasonable failure to pursue a settlement offer rather than its acceptance of one which will expose it to liability for bad faith. And that was the whole thing in that case. And, again, it seems to me that would apply here. Allstate was presented with a demand for the full policy limits. There's no question, but that damage is prior to seeing the policy. It had no negotiating power whatsoever. There was not an opportunity to settle the case against Hamadi within the full policy limits because of that other 50 that was being negotiated with Mercury Insurance. It got a complete set-off for Mr. Hamadi. Mr. Hamadi is entitled to a defense. The other insurer that was sued as well, or was not sued but a claim made against the other insurer, was taken out of the case. Allstate did what was allowed under Illinois law, under the Pekin case, and under the Country Mutual case as well. There is a lot of argument made about what Rick Green was supposed to do in his communication with Mr. Hamadi. Like I mentioned, in O'Neill, and this court cited a Seventh Circuit case, this Bailey v. Prudence Insurance Company. The communication with the insurer is important because if there's an opportunity to settle within the policy limits, the insurer can then get a lawyer, contact the carrier and say, hey, protect me. At the point of the insurance, try to protect me. You can settle this case within the policy limits. Please settle the case, or have the lawyer say, please settle the case within the policy limits. In this Bailey v. Prudence case that was cited by this court, there was an opportunity for the insurance carrier on four different occasions to settle the case within the policy limits. Never communicated with the insurer about that opportunity. And then that was evidence of bad faith the Seventh Circuit found. And that's what this court and O'Neill relied upon. Because remember O'Neill, very famous case, you know, Gillen refused to pay when everybody said, hey, you know, that case is far in excess of the $20,000 or $25,000 policy limits. This person's hurts bad, there's clear liability. All the lawyers, different claims people, everybody except, I think the vice president claims or the president claims, everybody said, hey, you've got to pay. There was an opportunity there, time limits, demand. Pay the $20,000, I'll give you a complete release. So there was an opportunity in O'Neill where if Gillen would have paid their liability limits, the insurer would have been completely released. No such opportunity here. Because it's this additional insurance company, it's Mercury Insurance. They're negotiating as well. I mean, Meyer can't take a release for $100,000 because he'd be released for $100,000. She can get another $50,000. There was no opportunity to settle for the full policy limits for Mr. Hamadi that was present in this case as there was in the O'Neill case. What about Mr. Coker's argument that perhaps if Hamadi would have been at the table, they could have negotiated some kind of release that limited any further liability to the Mercury policy or something like that. I mean, you could have drafted something like that. I mean, that could be done, couldn't it? There may have been something drafted to that amount. But, I mean, there's a lot of possibilities, I suppose. But the issue that I'm trying to present is what was drafted. I mean, either that's bad faith or not bad faith. And my understanding is under the cases under Illinois law, it's not bad faith because he got the full benefit of the policy and his defense. I mean, the guy's not in any different position than he would have been if there would have been no release entered into. And I think their argument, what they're saying is we don't know whether he'd be in a different position or not because he never got the opportunity to try to do anything about it. That's their argument, right? He wasn't notified. Right, he wasn't notified. Right. Well, the notification is when if there could have been a settlement to take him out for the full policy. I mean, my understanding of the case is that the insurer needs to know if there's an opportunity to settle within the policy limits, he needs to be notified. But doesn't he have to be notified that this is a possible excess claim and he might want to get separate legal representation and those sorts of things? I'm not so sure the cases specifically say that. It would have been good, obviously, to keep the man notified as to what's going on. Again, the thinking here is this case is worth well more than $100,000. Mercury Insurance, the reason why the lawsuit was filed, by the way, because Mercury didn't pay their money within a timely manner. I mean, I think they eventually tendered it a month or so after the lawsuit was filed, but by then it was too late. Mercury had as much information as Allstate. They said they maybe had some kind of a coverage issue or something like that. I mean, I don't know. But Mercury was this other carrier that really held everything up. I mean, Allstate offered their money. If Mercury offers their money, maybe there's not going to be any lawsuit. But in any event, we talked about O'Neill, and in the same way with that Douglas case that was mentioned, Douglas talked about the duty to defend and whether there was an ambiguity in the policy and then illegally obligated to pay was the buzz phrase in the Gallant policy there because Gallant came in, they paid their money, then they walked away. And so their issue there was, well, hey, we don't have any duty to defend our insurance because we're not legally obligated to pay on the policy because we went ahead and already paid our limits. That was a duty to defend case. This is not a duty to defend case, and Douglas really doesn't apply here. There's also an argument made about, well, you need to get the consent of Mr. Hamadi before you take him off of the release. Well, the whole point of what bad faith is about is that the insurance company has control. The insurer is at the mercy of the insurance carrier. Under the contract, the insurance company decides to evaluate the case, to settle the case, to try the case, to hire defense counsel. If there was a requirement that the insurer has the consent to take themselves off of a release or to agree with the settlement, well, there wouldn't be any bad faith law because now the decision is made by the insurer and not the insurance company. All state was within its rights to do a settlement here and to make the best settlement it could with regards to its insurer. Whether or not there's bad faith is a legal question. Whether or not the settlement that was entered into, the settlement contract, the agreement, was bad faith, that's a legal question. But the one thing that is clear, and according to the Illinois Supreme Court in that Haddock case, the insurance carrier has exclusive control over settlement. It's not, if you were to say, well, the insurer has to give consent before the policy limits are tendered, that's really inconsistent with what the parameters of what bad faith law is really about. Thank you, Mr. Podesta. Mr. Coker, any rebuttal? I think all state misses a really key point about bad faith. The key issue of bad faith isn't if you tender the money. It's do you protect your insurer. It's not do you give them a bag of money. It's do you get a settlement to protect your insurer. That's the essence of what creates bad faith. As the Supreme Court said in Cramer in 97, as Justice Keene in this court said in 2004, that's it. It's not just giving money, consent, here you go. It's protecting the people you were hired to protect. So when I hear these arguments, oh, they gave the money, it's mind-boggling that that's not the only thing you do. You just can't do that and throw your insurer under the bus. You can't just say, hey, we're going to take care of all state and not worry about Joe Driver. You have to take care of Joe Driver. And that's in the typical bad faith case, sure, the insurer doesn't want to even give up the money. But an overlying theme is, hey, protect the insurer. Give them a chance to be protected or consent to it and so on. There was some talk about the Mercury policy issue. And the real truth of it is Mercury read the Illinois cases that said you can't stab into palaces. And therefore, if you collect any money from all states, you can't collect from Mercury. I'm not sure what it has anything to do with here, because there's a bunch of different things they could do. And I guess that's the other point. All states seem to put out their suggestors like they're these drums that just say yes whenever us plaintiffs call them. And they just write checks and ask us ways to give them to write checks. That is not how they work. I mean, this takes a little bit of common sense, or even if you've ever done those cases. They are not drums. They're intelligent, hardworking adjusters, typically, who run you through a bunch of hoops. They know how to negotiate. They will say things like Sonia Sturtevant told Rick Green to say. Whoa, no, how about we put them back on the release? How about filing a debt connection? They're not just bound to say yes to every attorney who asks them to do why. That isn't how it works. They're supposed to negotiate to protect their insurers and to get a settlement for their insurers, both of them. And I think that point is also missed here. You've got to at least try three minutes later saying, sure, what's wrong, sure, is not negotiating on behalf of your insurer or trying to get a release to get the mercury bonds or filing a debt connection, which is what I typically see done in my practice, are the reservations of rights and all that. There's some talk about a peaking case. This court, I'm sure, is aware that prior to 97, and even some cases since 97, 97 Supreme Court is Ukraine, where it tried to really point out the differences between 155 actions under the insurance code and third-party bad faith cases like this, where the insurer doesn't get a settlement, the insurer doesn't get a settlement for their insurer. The standards are different. And the third-party bad faith cases like this, the standards are going to be like negligence during insurances. Section 155 cases are vexatious, outrageous, and all that. Pekin used the wrong standard prior to Kramer. There's some other things, too. They issued a reservation of rights, but Pekin doesn't apply for those reasons at the least. Country mutual, there was a good faith finding that they had before they did that. And the insurer in that case said, hey, we don't want a settlement. They knew about it and had opportunities. So that's a little bit different as well. Again, I pointed out the issues with losing the benefits of the $100,000. You lose your leverage. We all know that. And Justice Stewart pointed out exactly what happens. Maybe the plaintiff's attorney says, hey, can you kick in another $500,000? Is there any way to get this? That's what happens when you bring the insurer in with making the wrong amounts of the deal. Again, thank you for your time and your consideration. Thank you both, gentlemen, for your briefs and arguments. We'll take this matter under advisement and issue a decision in due course.